Clifford **WILTZ, Raymond Broussard, Sr., Raymond Broussard, Jr., Terry Dale, Joseph Dejean, Roxanne B. Wiltz, Rena B. Broussard, Charlene C. Broussard and Lynette Dejean, Plaintiffs–Appellants,**

v.

**MOBIL OIL EXPLORATION & PRODUCING NORTH AMERICA, INC., et al., Defendants–Appellees.**

No. 90–4384.

United States Court of Appeals, Fifth Circuit.

Aug. 9, 1991.

**48**

Edmond L. Guidry, III, Guidry & Guidry, St. Martinville, La., for C. Wiltz, R. Wiltz, T. Dejean and L. Dejean.

Daniel G. Guidry, Guidry & Guidry, St. Martinville, La., for R. Broussard, Sr., Rena Broussard, R. Broussard, Jr. and C. Broussard.

Suzanne M. Jones, Timothy J. McNamara, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., for General Motors.

R.K. Christovich, Christovich & Kearney, New Orleans, La., for defendants-appellees.

Before HENLEY,[*] KING and GARWOOD, Circuit Judges.

HENLEY, Circuit Judge.

In this negligence and products liability action, appellants Clifford Wiltz, Raymond Broussard, Sr. (Broussard), Raymond Broussard, Jr. (R.J.) and Terry Dale, Joseph Dejean, and their spouses, appeal from an order of the district court granting a directed verdict in favor of appellee Detroit Diesel Allison, a division of General Motors Corporation (DDA).[1] The court found that an allegedly defective engine manufactured by DDA was not the legal cause of a flash fire which injured appellants. We reverse and remand.

Appellants, experienced members of an oilfield workover crew, were engaged in circulating an oil well[2] near Bayou Latenatche, Louisiana. A DDA diesel engine powered the pump used for circulation. A diesel engine can ingest natural gas fumes concentrated in the area of the engine, and when this occurs the engine may overspeed, and the resulting sparks can trigger a flash fire. In order to stop the DDA engine in question from overspeeding, an operator had to manually shut off the air intake valve.

On the day of the accident, June 23, 1986, a senior production foreman informed Broussard, who was in charge of the crew, that the well was "gassy" and instructed him to circulate the well by running the circulation flow line to a distant tank battery instead of the usual mud tank nearby. Broussard then consulted with a production technician, who recommended circulation through the mud tank, as it would allow the crew to monitor the returns more closely. The technician also warned Broussard that the gassy well was dangerous and had caused problems in the past. Broussard reported this recommendation to the foreman, who approved the change, but further admonished Broussard's crew to proceed with care.

Broussard testified that although the well was emitting gas for about fifteen or twenty minutes before the fire, the amount of the gas was "normal." When the well started "blowing a little harder," he instructed R.J. to "pinch off" the gas flow at the well's valve. R.J. had difficulty in do-

---

* Circuit Judge of the Eighth Circuit, sitting by designation.

1. Appellants also filed claims against Mobil Oil Exploration & Producing North America, Inc. These claims were dismissed pursuant to a settlement agreement.

2. A well is "circulated" to remove oil and gas deposits in the well and to develop a hydrostatic head of salt water on top of the well to prevent a well "blowout."

ing so and asked Dejean for assistance, but they were unable to "pinch off" the valve. Broussard testified that a "short, short time" before the fire the well started "blowing real hard" and he signalled Wiltz to shut down the engine. Before Wiltz could comply, the pump ignited.

On cross-examination, Broussard stated that the accident could have been prevented if the engine had been shut down when the well started emitting significant gas. Broussard, however, stated he "never had a chance to shut it down" because when the gas "got real hard" he had "just a few seconds, not even a second probably." Counsel for DDA then impeached Broussard with a statement he had given three weeks after the accident in which he indicated that the well was gassing badly for five minutes before the explosion. Broussard responded that he was not lying when he gave the statement and insisted that "it must not have been that long." Counsel also asked Broussard if he was lying when he stated in his deposition that it was five minutes after he told R.J. to pinch off the well valve that he gave the order to Wiltz to shut off the engine. Broussard responded it "could have been."

Edward Roberts testified, without objection, as appellants' expert in the safety of workover operations. Roberts held the opinion that the workover crew performed the circulation in a safe manner. In particular, Roberts testified that Broussard acted properly in not shutting off the well when it first started emitting gas, explaining that it was a judgment call when to terminate a circulation procedure because to do so prematurely might risk a well "blowout." According to Roberts, when a well emitted an unexpected volume of gas, proper procedure was to "begin to slowly shut back, pinch back and then cut it off completely."

Appellants also presented the testimony of Walter Taber, an expert in mechanical engineering, who testified that the DDA engine caused the fire and was defective because it failed to have warnings, an automatic overspeed shutdown, spark arresting mufflers, and a water-cooled manifold.

At the close of appellants' evidence DDA moved for a directed verdict, arguing that appellants had waived their negligence claim and had produced insufficient evidence from which a jury could find that the engine was defective when it left DDA's control. DDA also argued that the engine was not the legal cause of the fire. The court denied the motion. At the close of its evidence, DDA renewed its motion. The court granted the motion on the ground that "Broussard's failure to act properly under the circumstances was the cause in fact of this fire." Specifically, the court found "this accident would not have occurred if [Broussard] had given ... the order to shut down the engine immediately after the well began blowing gas uncontrollably four or five minutes before the flash fire."

The sole issue on appeal is whether the district court erred in directing the verdict because there was conflicting evidence whether Broussard had sufficient time to shut down the engine after the well emitted significant gas.[3] In reviewing this issue, we adhere to this court's well-established standard for directed verdicts espoused in *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc). Weighing all evidence in the light most favorable to the non-moving party, we uphold a directed verdict if "the facts and inferences point so strongly and overwhelmingly in favor of one party that ... reasonable men could not arrive at a contrary verdict...." *Id.* at 374. "However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Id.* at 375 (footnote omitted).

---

**3.** Although initially the district court expressed considerable doubt whether appellants had proved all the elements of their negligence and product liability claims, in its written opinion the court directed the verdict solely on the ground that the engine was not the legal cause of the fire. At oral argument DDA conceded that the district court did not decide whether the design of the engine was defective or any of the other grounds in support of its motion for a directed verdict, and accordingly these issues are not before this court.

In this case, we agree with appellants that the court impermissibly resolved an internal conflict in Broussard's testimony. Although he indicated in a deposition and statement that he might have had five minutes before the fire to shut down the engine, at trial he insisted he had insufficient time. In its brief DDA argues that it was "obvious" that Broussard tried to "play dumb throughout his testimony." Whether Broussard was "playing dumb" was for the jury to decide, not a court. In *Boyle v. Pool Offshore Co.*, 893 F.2d 713, 716–17 (5th Cir.1990), this court recently held that a court cannot dismiss a plaintiff's testimony because it was impeached by a prior inconsistent statement, noting that it was the jury's function to assess the credibility of the witness. Where as here, "each side presented substantial evidence in support of its explanation of the accident[,] [t]he jury reasonably could have rendered its verdict either for appellee or appellants." *Id.* at 717. In such circumstance, a district court errs in directing a verdict.

Our disposition of this case likely may result in a retrial, causing a waste of private and judicial resources. We remind the district court that the better practice would have been to reserve ruling on the motion for a directed verdict and let the case go to the jury. "The primary reason we encourage district courts to reserve judgment on motions for directed verdict is that if the court grants a judgment n.o.v., a retrial is avoided if we reverse the j.n.o.v. because there is a jury verdict that can be reinstated." *McPhillamy v. Brown & Root, Inc.*, 810 F.2d 529, 533 (5th Cir.1987). "At least nine other Circuits have endorsed this practice." *Id. See, e.g., Holmgren v. Massey–Ferguson, Inc.*, 516 F.2d 856, 859 n. 2 (8th Cir.1975) ("Once again we emphasize the wisdom and expediency of reserving a ruling on such motions [for directed verdicts]

until the jury has had the opportunity to weigh the evidence.").

Accordingly, the judgment of the district court is reversed and remanded for further proceedings not inconsistent with this opinion.[4]

---

4. At oral argument appellants suggested that the timing of Broussard's shutdown order was legally irrelevant if the engine was defectively designed as they contend. On remand the district court and the parties may wish to explore the relationship of proximate cause to appellants' alleged fault under Louisiana products liability law. *See Bell v. Jet Wheel Blast*, 462 So.2d 166, 171 (La.1985) (though victim's harm must result from condition of product victim's contributory fault not a bar to recovery; however, in appropriate case comparative negligence may reduce amount of damages). *See also Horton v. Buhrke*, 926 F.2d 456, 460 (5th Cir.1991); *Perry v. Chevron U.S.A., Inc.*, 887 F.2d 624, 628 (5th Cir.1989), *pet. for reh. denied*, 893 F.2d 682 (5th Cir.1990).